LYMAN PEEBLES & another vs. BOSTON AND ALBANY RAIL-
ROAD COMPANY.

In an action by a consignee against a carrier for the conversion of a part of a car load of grain in bulk, it is competent for the plaintiff upon the question of title to prove that he had paid for the entire car load.

It is no ground of exception, that incompetent evidence was adml.red to prove a fact which is afterwards proved by other evidence, admitted without objection.

The "White Line," an association of railroad companies, of which the B. & A. Company was one, carried freights coming in White Line cars over the I., B. & W. Railroad under the contracts which the I., B. & W. Railroad Company had made. A consignor loaded in a White Line car, upon the I., B. & W. Railroad, 22,630 pounds of grain to be forwarded to a station upon the B. & A. Railroad, and received from the I., B. & W. Railroad Company a bill of lading, which he sent to the consignee, for a car load of grain in bulk on White Line car, weight 20,000 lbs. more or less, freight not to exceed 75 cents per 100 lbs.; the way-bill of the White Line stated the weight to be 20,000 lbs.; upon the arrival of the car at the station upon the B. & A. Railroad, that company took from the car and sold a portion of the grain, claiming the right so to do because it was not included in the way-bill. In an action by the consignee against the B. & A. Railroad Company for the conversion of that portion of the grain, *Held*, that the only questions for the jury were, Did the plaintiff own all the grain in the car? Was he entitled to its possession? Did the defendant convert a portion to its own use? and that if the defendant sold the grain claiming that it was not the plaintiff's property, or if it had given the plaintiff notice that it would not receive the freight money for it, the plaintiff was not bound to tender such money; and that the measure of damages was the value of the grain at the time and place it was taken, less freight at the rate of 75 cents per 100 lbs.

TORT, for the alleged conversion of 38 bushels of rye, part of the contents of a freight car.

At the trial in the Superior Court, before *Bacon*, J., the plaintiffs proved that they ordered two car loads of rye by the following letter : " Dec. 31, 1870. Messrs. E. S. Easton & Co., Peoria, Ill. Gentlemen : Send us 2 cars rye. We want a good quality and clean, not particular about its being white, but good sized berry. Have sold it cheap, so buy and send it so that we shall make something if possible. Bill to West Springfield, and oblige, Respectfully yours, Peebles & Mattoon. M." To this letter they received the following reply : " Office of E. S. Easton & Co., General Commission Merchants, 109 South Water Street, Peoria, Ill., Jan. 1871. Messrs. Peebles & Mattoon, Springfield. Gents : Inclosed find invoice of bill of lading of your other car rye shipped to-day. Sorry we could not get it off before, but cars

have been very scarce and could not get one before to-day. Have drawn on you to-day for amount of invoice. Please honor draft when presented. Hoping the rye may give you satisfaction, and tnat we may hear from you soon again, we are yours, respectfully, E. S. Easton & Co."

Thomas Mattoon, one of the plaintiffs, testified, against the defendant's objection, in answer to the question how much rye he bought and paid for, as the contents of the car in question, that he paid for 404 bushels and 6 lbs., amounting to 22,630 pounds, and that this was the amount called for by his invoice. The invoice was afterwards put in evidence without objection.

On cross-examination, he testified that it was very common for shippers of grain to load more grain in a car than they return to the railroad, for the sake of saving freight; that the difference in freight in this case between the amount billed and the amount invoiced was between $16 and $20, and that the plaintiffs noticed the discrepancy between the bill of lading and the invoice, but did not inform the defendant of it.

The plaintiffs put in evidence a bill of lading of the rye contained in the car, given by the Indianapolis, Bloomington & Western Railway Company, which bill of lading described the quantity of rye as 20,000 pounds more or less. The material portions of the bill of lading were as follows: "Indianapolis, Bloomington & Western Railway Co., Illinois Division. Peoria, January 13, 1871. Received from E. S. Easton & Co. the following described packages, in apparent good order, (contents and value unknown,) consigned as marked and numbered in the margin, to be transported over the line of this road to         station, and delivered in like good order to the consignee or owner, at said station, or to such company or carriers (if the same are to be forwarded beyond said station) whose line may be considered a part of the route to the place of destination of said goods or packages; it being distinctly understood that the responsibility of this company as a common carrier shall cease at said station when delivered to such person or carrier; but it guarantees that the rate of freight for transportation of said packages from the place of shipment to West Springfield, Mass., shall not ex-

ceed 75 cents per cwt. Freight to be paid upon the weight by the company's scales.

" Marks and consignees, Peebles & Mattoon, West Springfield, Mass. ; articles, car Bulk Rye, 747 W. L.; weight, 20,000 M. or L. S. W. Corwin, Freight Agent."

The road which gave this bill of lading had no business connection with the defendant. No person other than the plaintiffs ever made claim for the 38 bushels of rye in question. No portion of the rye in the car was billed to any other party. Mattoon testified that the rye came in White Line car 747.

The plaintiffs proved that they received from the defendant but 20,500 pounds of rye, and offered to prove that the defendant took out of the car 38 bushels of rye, before delivering the 20,500 pounds to them. The defendant objected to this evidence, but the court overruled the objection and admitted it. Mattoon testified that he had bought grain before from Easton & Co., and always bought delivered in the cars.

The plaintiffs called one Hamilton, a freight agent of the defendant at Springfield, who testified on cross-examination that the term " a car load of grain " means 20,000 pounds ; and though sometimes more than that quantity is put into a car by special arrangement, the term car load means just that quantity. He also testified on reëxamination that more than 20,000 pounds was often billed as a car load. He further testified that the bill of lading of the Indianapolis, Bloomington & Western Railroad Company did not come to the knowledge of the defendant ; that the defendant was one of the corporations making " The White Line," so called, which included the corporations whose roads extended east from Indianapolis ; that the only bill which the defendant had of the car containing rye was the way-bill, which was as follows : " White Line Central Transit Company. No. car 747 ; way-bill No. 309 ; merchandise forwarded from Indianapolis to Springfield, Jan. 16, 1871. Initials, W. L.; consignee, Peebles & Mattoon, West Springfield, Mass. ; Rye, 20,000 lbs. rate, 65 ; advanced charges, 20.00 ; freight charges, 130.00. Amount to be deducted, viz : 37.91 ; per cent.; divisions, 24.59 40.47, 27.03 ; total, 130 ; ' that the White Line carried freights

according to the contracts of the Indianapolis, Bloomington & Western Railroad, and the cars of the White Line were used for the purpose. He testified further that the rye was removed from the car in which it came because there was more grain in the car than the way-bill called for, and his instructions were in such cases to remove the excess, but that he had not received instructions to accept freight for such excess when offered by the person owning it.

The plaintiff Mattoon testified that they never offered to pay freight on the 38 bushels of rye, and that previous to the arrival of the rye he had been told by the cashier of the defendant, to whom the plaintiff for many years had paid the freight bills, that the order was not to accept freight on the excess of grain above the quantity billed.

The cashier denied that he had made such a statement previous to the transaction in question, and testified that no such orders had been given by the defendant, and that the freight on goods consigned to West Springfield were payable to the agent at that place, and not in Springfield.

Hamilton testified, on cross-examination, that the local freights on rye on the several roads making up the line from Peoria to West Springfield, amounted to $1.48½ per hundred pounds, and the regular local freights on rye on the roads from Indianapolis to West Springfield, amounted to 91½ cents per hundred pounds, and that the rate, 75 cents per hundred pounds, named in the bill of lading, was a rate made by special contract by the consignor with the road at Peoria. He further testified that the defendant took 2163 pounds of rye from the car, and about six weeks afterwards sold it ; that it was not held or sold because of any question of freight, but because of the under-billing.

The plaintiff Mattoon testified that he paid his freight bills every thirty days ; that he before had had cars come containing more grain than was billed, and that he paid freight on the excess if it was charged to him, but not otherwise.

The defendant asked the court to instruct the jury, " That the plaintiffs could not claim of the defendant any more rye than the quantity specified in the bill of lading of the Peoria road, and

that evidence of any greater quantity being in the car at West Springfield would not affect the defendant's rights:

" That if the consignor, for the purpose of defrauding the carrier, put into the car a larger quantity of rye than he informed the railroad company that he had put in, the excess of rye so put into the car did not become the property of the plaintiffs, if the plaintiffs were innocent of the fraud:

" That if the plaintiffs participated in the purpose of defrauding the roads, by having rye transported without payment of freight, they were not entitled to have the rye so transported delivered to them at West Springfield." This instruction was given.

" That the defendant having undertaken, as by the way-bill of the White Line, to carry only 20,000 pounds, was not under any obligation to deliver more than that amount to the consignee:

" That the plaintiffs were bound by the amount stated in the White Line bill, that being the only bill which affects the rights and liabilities of the defendant:

" That the defendant had a right to hold any excess beyond the quantity contracted for, subject to the order of the consignor, or to return it to the party from whom it received it, or to sell it for the benefit of whom it might concern:

" That ' more or less' in the bill of the road at Peoria could not be interpreted to cover any quantity of rye in excess of the quantity named in the bill, which was put into the car in fraud of the carrier:

" That if the plaintiffs were entitled to have the excess of rye delivered to them at West Springfield, they were so entitled only on payment or tender of the amount of freight due them, and that the freight due would be the amount of the local freights on all the roads between Peoria and West Springfield:

" That if the plaintiffs were entitled to recover, they were entitled to recover only the value of the rye at West Springfield, less the freight charges on it; and that the freight charges were the amount of the local freight from Peoria to West Springfield, which were $1.48½ per hundred pounds, or if not less the local freights from Peoria, then less the local freights from Indianapolis, 91½ cents per hundred pounds:

" That if entitled to recover at all, the plaintiffs could recover only the value of the rye at Peoria, less the amount of local freight, to wit, $1.48½ per hundred pounds, or if that was not the rule, less the amount of local freights from Indianapolis, 91½ cents per hundred pounds :

" That a previous statement from an employee of the defendant, not the person to whom freight on this rye was payable, that he had received instructions not to receive freight for overweight, would not relieve the plaintiffs from the obligation to pay or tender the freight before being entitled to the possession of the rye :

" That if the plaintiffs were entitled to the excess of rye above 20,000 pounds, on payment of the freight therefor, the defendant was not under any obligation to keep the rye more than a reasonable time after its arrival ; that five weeks was more than a reasonable time, and that the defendant was entitled to sell the rye at the end of that time, the freight neither having been paid nor tendered."

The court refused to give any of the instructions asked for except as before stated, and in addition to other instructions, to which no exceptions were taken, instructed the jury as follows :

" This is an action of trover brought to recover property wrongfully taken. The plaintiffs must show that they are the owners of the property, and that they are entitled to the possession of it. And if they prove this they prevail in the action, and are entitled to recover the fair market value of the property.

" It is for you to say whether, from the evidence, this grain was the property of the plaintiffs, and then whether they were entitled to the possession of it. A man may own property and yet not be entitled to the possession of it. You will inquire first, Did the plaintiffs own the rye ? And, second, were they entitled to the possession of it ? It may be held for the freight due on it. You have the papers, and will say whether the plaintiffs bought and paid for this rye. If so, were they entitled to the possession of it ? If they were in default about paying the freight, they were not entitled to the possession ; but if the defendant gave the plaintiffs notice that the rye would not be delivered on the payment of freight, then the plaintiffs would have the right to

the rye without tendering or paying the freight. If you find, therefore, that the plaintiffs could not have paid the freight and obtained the rye, they would not be obliged to make a tender in order to get the goods ; and it will not be a defence to this action that the freight was not paid, and it would be no defence to the action that freight was not paid nor tendered, if the defendant undertook to hold the rye for any other cause than the non-payment of the freight.

" Another defence to the action by the defendant is fraud in the consignors or plaintiffs or both. It is claimed that Easton & Co. intended, by under-billing (as it is termed) the rye, to get the excess of grain carried over the road without paying for its carriage. If this was done with the intention to prevent the railroads from getting their pay, it would be a fraud ; what the law terms a fraud. That of itself would not be a defence to this action ; but if the attempt by Easton & Co. was participated in by the plaintiffs, then the plaintiffs would not be entitled to the surplus of the grain ; and if you find that the plaintiffs did participate, your verdict will be for the defendant. The burden of showing this participation is on the defendant. The law presumes that the plaintiffs are innocent.

" As to the measure of damages. If the plaintiffs are entitled to recover at all, they can recover the value of the rye at the time and place where it was taken from the other rye, less the freight at 75 cents per hundred pounds.

" I also instruct you that if you find that the defendant sold the overplus of rye, or converted it before the plaintiffs had reasonable time to pay the freight on it, the defendant is liable ; and separating the surplus from the other rye is evidence tending to show a conversion of it to the defendant's use."

The jury were requested to answer the following questions when they returned their verdict :

" Did Easton & Co. intend, without the consent of the railroads, to procure the conveyance of the rye without paying freight for the whole quantity at the rate of 75 cents per hundred pounds ? "

" Did the plaintiffs knowingly aid or assist in such purpose ? "

They answered both questions in the negative, and returned a verdict for the plaintiffs for the value of the rye at Springfield, less the freight at 75 cents per hundred weight. And the defendant excepted.

*A. L. Soule*, for the defendant. The evidence of the plaintiffs as to the quantity of rye paid for by them and called for by the invoice was incompetent for any purpose. The payment was *res inter alios*. It was, in substance, testimony that Easton & Co. charged them for that quantity, and said they had forwarded it, which is evidence incompetent to show the quantity which the defendant was under obligation to deliver. The statement that the same amount was called for by the invoice is open to the further objection that it was oral testimony as to the contents of a written instrument. Nor is it any answer to the objection that the invoice was afterward put in evidence without objection. The incompetent evidence having been admitted in proof of the quantity of grain which the defendant ought to deliver, it would have been useless for the defendant to object to the introduction of other evidence to the same point, however incompetent, because the alleged fact had been proved, and, for the purposes of this trial, as completely proved, by the testimony objected to as it could be by any means. The admission of this testimony relieved the plaintiffs from the duty of producing competent evidence of the ownership of the grain, and of the amount of grain which the defendant undertook to deliver.

The bill of lading of the Indianapolis, Bloomington & Western Railway Company, by which that corporation undertook to carry the rye to Indianapolis and deliver it to the connecting road, was not the contract of the defendant, (the two roads having no business connection,) and did not in any way bind the defendant. *Nutting* v. *Connecticut River Railroad Co.* 1 Gray, 502. The only contract which the defendant knew anything about is shown in the White Line way-bill; and the plaintiffs do not show any other contract with the defendant. According to the terms of this way-bill, the defendant and its associate roads undertook to carry from Indianapolis to West Springfield 20,000 pounds of rye. The evidence shows that this contract was not made with the

plaintiffs; and the beneficial interest in it having come to the plaintiffs, they can claim under it only the quantity of rye which the contract calls for. And the way-bill being the only evidence of the contract which the defendant had, was, between it and the plaintiffs, as conclusive in regard to the quantity of rye as is a bill of lading in the hands of an assignee or a consignee not a party to it; and a bill of lading so held is absolutely conclusive. *Sears* v. *Wingate,* 3 Allen, 103. Angell on Carriers, § 231.

The defendant had no means of knowing that the excess of rye beyond the amount stated in the way-bill was claimed by the plaintiffs. The plaintiffs never demanded it. They never informed the defendant that they had bought the quantity contained in the car; but, for purposes of their own, concealed this fact. Had the way-bill called for eighty barrels of flour, it would not have indicated that twenty other barrels in the car belonged to the plaintiffs; no more does a way-bill for 20,000 pounds indicate that 2663 pounds more belong to the plaintiffs. Grain in bulk may be owned a part by one and a part by another, and may be sold a part to one and a part to another, without separation. *Cushing* v. *Breed,* 14 Allen, 376. Since it may be so owned and dealt with, there is no reason why the grain of different owners may not be in bulk in one car. The separation, therefore, of the excess from the amount of rye called for by the way-bill was not a conversion under the circumstances, whatever might have been the rights of the plaintiffs in relation to it, if they had made their claim known.

If the excess of the rye above 20,000 pounds was put into the car at Peoria, it was never so delivered for transportation to West Springfield as to pass the title to the plaintiffs. The purchase was of rye delivered on the cars; which must be understood as meaning, so delivered that the carrier knew of its delivery, and undertook to transport it, whereas it appears that the delivery to the railroad at Peoria was as of 20,000 pounds, and that that railroad, acting as agent for the consignors and led by them to believe that there was only that quantity, delivered it as only 20,000 pounds to the defendant and its associates, thereby causing the carriers to undertake the carriage and delivery of only that quantity.

On the evidence it is manifest that the presence of the excess in the car above the amount named in the bill of lading and way-bill was not the result of accident or mistake, but occurred with the knowledge and consent of the consignors. Why else did the invoice call for the excess? This being so, and the real quantity being concealed from the defendant and its associates, and from the carriers at Peoria, no contract for a special rate for transporting the excess of rye was made by the consignors with the White Line, and the roads were entitled to charge full local rates on the excess. The consignors not only did not make a special contract, but for some purpose endeavored to conceal the fact, that the excess was in the car. They certainly cannot be in any better position regarding the carriage of the excess than if they had openly and fairly delivered it for carriage, without making a special bargain as to the freight. The court should have ruled, therefore, that in ascertaining the damages, the freight at the rate $1.48½ or 91½ cents per hundred should be deducted from the value of the rye in West Springfield.

There was no evidence which justified the instruction to the jury, " if you find that the plaintiffs could not have paid the freight and obtained the rye, they would not be obliged to make a tender," and the jury should have been instructed as the defendant requested, " that a previous statement from an employee of the defendant, not the person to whom freight on the rye would be payable, that he had received instructions not to receive freight for overweight, would not relieve the plaintiffs from obligation to pay or tender the freight before being entitled to the possession of the rye."

*G. M. Stearns*, (*M. P. Knowlton* with him,) for the plaintiff.

ENDICOTT, J. The defendant has no just ground of exception to the admission of the evidence objected to at the trial.

It was competent, on the question of title, for the plaintiffs to prove that they had bought and paid for 22,630 pounds of rye, the contents of the car which arrived at West Springfield consigned to them. The oral evidence, that the bill of lading called for that amount, did not injuriously affect the defendant, as the bill itself was put in evidence without objection. *Merrick* v. *Plumley*, 99 Mass. 566. *Roberts* v. *Wentworth*, 5 Cush. 192.

The rulings of the presiding judge, in submitting the case to the jury, were not erroneous.

The claim of the defendant, that it was bound to deliver to the plaintiffs only the 20,000 pounds of rye called for in the way-bill of the " White Line " Company, cannot be sustained upon the evidence reported. It appears by the bill of exceptions that Easton & Co. received from the Indianapolis, Bloomington & Western Railway Company a bill of lading, which was sent to the plaintiffs as consignees, of a car load of rye in bulk, on the " White Line " car No. 747, weighing 20,000 pounds, *more or less*, the freight not to exceed 75 cents per hundred, and to be paid upon the weight by the company's scales. The way-bill given by the " White Line," though more brief, differed in its recitals only in the weight, which was stated to be 20,000 pounds. On the arrival of the car at West Springfield, the defendant, finding that there was an excess of weight over the White Line way-bill, took 2163 pounds of the rye, which it afterwards sold, and delivered the balance, 20,500 pounds to the plaintiffs, claiming that the plaintiffs were entitled to no more than that way-bill demanded. But it also appeared in evidence that the defendant was one of the corporations composing and owning the so-called White Line Company, and that the White Line carried freights in its cars, according to the contracts made by the Indianapolis, Bloomington & Western Railway Company. Indeed, the way-bill of the White Line recognizes this contract with Easton & Co. in terms, as to freight and in other particulars, except the weight of the rye. It was a car load in bulk, weighing 20,000 pounds more or less, which the Indianapolis, Bloomington & Western Railway Company agreed to carry; the White Line undertook to carry the same car load, and was bound to do it according to that contract, and the omission of the words " more or less," or the evidence that by usage 20,000 pounds was a car load, could not entitle the defendant to withhold or take from the plaintiffs the excess of 20,000 pounds, if the plaintiffs owned it. If they were owners, they were entitled to receive the contents of the car upon payment of freight. The only questions for the jury, therefore, were whether the plaintiffs did own all the rye in the car, and were entitled to the posses-

sion, and whether the defendant had converted the excess to its own use. These questions were presented to the jury upon proper instructions. It does not appear, in the evidence reported, that the defendant sold the excess because the freight was not paid on it, but because it claimed to have the right to do so, as against the consignees, it not being included in the way-bill. There was also some evidence, the weight of which was for the jury, that the orders of the defendant company were not to take freight on the excess of grain, above the amount named in the way-bill. If the defendant sold the rye for other causes than non-payment of freight, or if it gave notice that the freight would not be received for it, the plaintiffs were not bound to make a tender, and the instructions to the jury on this part of the case were correct. *Adams* v. *Clark,* 9 Cush. 215. *Hazard* v. *Loring,* 10 Cush. 267.

The rule of damages was correctly given, that the plaintiffs could recover the value of the rye at the time and place when taken by the defendants, deducting the freight at the through rate of 75 cents per hundred. As this was the rate named in the White Line way-bill, there is no foundation for the claim that the defendant was entitled to local freight, at the rate of $1.48½ per hundred. *Briggs* v. *Boston & Lowell Railroad Co.* 6 Allen, 246. *Ingledew* v. *Northern Railroad,* 7 Gray, 86.

The jury having found there was no fraud on the part of Easton & Co. or the plaintiffs, it is unnecessary to consider the rulings on that point. *Exceptions overruled.*